## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,　　　　） | |
| 　　　　　　　　　　　　　　　　　） | |
| v.　　　　　　　　　　　　　　　　） | Criminal Action No. 16-cr-71 (TSC) |
| 　　　　　　　　　　　　　　　　　） | |
| JEONG SEON HAN,　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　） | |
| 　　　　Defendant.　　　　　　　　　） | |

### MEMORANDUM OPINION

Defendant Jeong Seon Han is a South Korean national who formerly served as the Chief

Engineer aboard the *Pacific Breeze*, a U.S.-flagged commercial fishing vessel.  Han was indicted

in this district in April 2016 on the following three charges:

1)  Knowing Failure to Maintain Accurate Oil Record Book – Act to Prevent
    Pollution from Ships on or about December 4, 2014, in violation of 33 U.S.C.
    § 1908(a), 18 U.S.C. § 2, and 33 C.F.R. § 151.25;

2)  Knowing Failure to Maintain Accurate Oil Record Book – Act to Prevent
    Pollution from Ships on or about June 29, 2015, in violation of 33 U.S.C.
    § 1908(a), 18 U.S.C. § 2, and 33 C.F.R. § 151.25; and

3)  Discharge Without Operating Oil Separating Equipment – Act to Prevent
    Pollution from Ships, in violation of 33 U.S.C. § 1908(a), 18 U.S.C. § 2, and
    33 C.F.R. § 151.10(b).

(Indictment at 6-8).

Before the court are Han's two motions for dismissal of the Indictment – one based on

improper venue (the "Venue Motion"), and another based on failure to state an offense (the

"FTSO Motion").[1]

Upon consideration of Han's Venue Motion, the parties' briefs in support thereof and

in opposition thereto, and the parties' arguments at the June 21, 2016 motions hearing, the Venue

---

[1] The briefs filed in support of and in opposition to the Venue Motion will be referred to herein
as the "Venue Opposition," "Venue Reply," "Venue Sur-Reply," and "Venue Sur-Sur-Reply."

Motion is hereby **GRANTED**.  Accordingly, the Indictment against Han is hereby **DISMISSED**

**WITHOUT PREJUDICE**, and the FTSO Motion is hereby **DENIED AS MOOT**.

## I.      BACKGROUND

### a.   The Applicable Regulatory Regime

The United States is part of an international regime called the International Convention

for the Prevention of Pollution from Ships, as modified by the Protocol of 1978, Feb. 17, 1978,

94 Stat. 2297, 1340 U.N.T.S. 61 ("MARPOL"), which regulates oil discharge from vessels at

sea.  MARPOL aims to reduce pollution of the marine environment by specifying how ships are

to dispose of certain wastes, including oil.  Among other things, MARPOL prohibits vessels

from discharging oily wastewater into the sea unless it is first processed through filtration

equipment, and requires that such discharges be recorded in an oil record book that is available

for inspection upon entry into port.  MARPOL was enacted into U.S. law in 1980 by the Act to

Prevent Pollution from Ships, 33 U.S.C. §§ 1901, *et seq.* ("APPS"), which makes it a crime for

any person to knowingly violate MARPOL, APPS, or regulations promulgated thereunder by the

U.S. Coast Guard.

### b.   The Coast Guard's Investigation In American Samoa

The *Pacific Breeze* is a U.S.-flagged commercial fishing vessel owned and operated by

Pacific Breeze Fisheries, LLC ("PBF"), a U.S.-domiciled company based in Guam.  (Venue Mot.

Ex. 1 ¶ 7; Venue Mot. Ex. 5 ¶ A).  At the time of the events in question, the *Pacific Breeze*'s

captain was American citizen Michael Sundquist.  (Venue Mot. at 4 n.2; Mot. to Amend

Conditions of Release of Material Witnesses at 4 n.1, *In re Detained Material Witness Seafarers*,

No. 1:16-mc-00961-TSC (D.D.C. May 4, 2016), ECF No. 1).  On June 30, 2015, the *Pacific*

*Breeze* arrived in Pago Pago, American Samoa, a U.S. territory, to unload its catch before

undergoing maintenance.  (Venue Mot. Ex. 1 ¶¶ 9-10).  The ship was also scheduled for an annual inspection by the U.S. Coast Guard about a week later, on July 7, 2015.  (*Id.* ¶ 11).

The parties agree that Han served as Chief Engineer of the *Pacific Breeze* from November 2014 until around the time it arrived in American Samoa.[2]  Han declares that he was planning to fly back to South Korea from American Samoa on July 6, 2015, but was rebooked on a July 8, 2015 flight after his original flight was delayed.  (*Id.* ¶ 14).  Thus, he was originally scheduled to leave American Samoa the day before the Coast Guard inspection began, but was rescheduled to leave the day after the inspection began.  After his flight was delayed, Han decided to remain onboard the *Pacific Breeze* to help his successor prepare for the inspection.  (*Id.* ¶ 15).

During the inspection, a Coast Guard official confiscated the passports of everyone on board the ship, including Han.  (*Id.* ¶ 16).  It appears that the crewmembers' passports were then given to American Samoa Immigration officials, who held them for the remainder of the crew's stay in American Samoa.  (Venue Sur-Sur-Reply Ex. A) ("[D]uring the inspection, and after the customs hold was in place, American Samoa Immigrations possessed the crew's passports.  The passports were returned to the crew when they departed for the U.S.").[3]  Sometime prior to his

---

[2] Han declares that his service as Chief Engineer ended on June 13, 2015, such that he was no longer serving as Chief Engineer when the Coast Guard's inspection began on July 7, 2015.  (Venue Mot. Ex. 1 ¶¶ 6, 12).  The Government states that Han served as Chief Engineer until on or about July 2015, but acknowledges that Han "was the off going Chief Engineer" at the time of the inspection.  (Venue Opp'n at 1).

[3] The Government stated at the motions hearing, without any elaboration, that Han's passport was confiscated by American Samoa Immigration officials, not by the Coast Guard.  Han, however, has identified by name the Coast Guard official who he claims confiscated his passport, declaring under penalty of perjury that "[o]n July 7, 2015, the Coast Guard's Chief Warrant Officer Brian Anderson began the inspection of PACIFIC BREEZE and took the passports of everyone onboard, including mine."  (Venue Mot. Ex. 1 ¶ 16).  Presumably, the Government could have obtained a declaration from Chief Warrant Officer Anderson stating that he did not take Han's passport, but, for whatever reason, it has not done so.  Given the absence of any evidence supporting the Government's assertion at the motions hearing, the court will credit

rebooked July 8, 2015 flight, Han asked a Coast Guard official "if he could return to South Korea because he had a flight booked." (*Id.*). Han's request was denied on the basis that the Coast Guard "was conducting an inspection, he was a part of the crew, and [the Coast Guard] may [have] need[ed] him to answer questions." (*Id.*).

On the first day of the inspection, July 7, 2015, U.S. Coast Guard Sector Honolulu was notified that the inspection had "identified deficiencies related to oil/oil waste management and recordkeeping," as well as "an inoperable oil water separating system," on board the vessel. (Venue Mot. Ex. 2). One week later, on July 14, 2015, the Coast Guard's Captain of the Port for Honolulu issued an order exercising control over the vessel. (*Id.*). The order stated that the *Pacific Breeze* was prohibited from leaving port until it could show "proof that the oily water separating equipment" met applicable standards and could "demonstrate proper oil & oil waste management, proper recordkeeping for oil & oil waste management, and proper operation of the oily water separating equipment." (*Id.*).

The Coast Guard's inspection lasted until August 5, 2015. (Venue Mot. Ex. 1 ¶ 20). Han declares that he "was not allowed to leave the vessel" for the approximately one month that "the Coast Guard's inspection was in progress." (*Id.* ¶¶ 21-22).[4] Moreover, during the pendency of

---

Han's declaration on this point. And, in any event, the clear evidence of coordination between the Coast Guard and American Samoa Immigration officials during the relevant time period (discussed in greater detail *infra*) amply demonstrates that the United States Government played a guiding role in the actions taken by American Samoa Immigration officials in support of the Coast Guard's investigation onboard the *Pacific Breeze*. Accordingly, even if Han's passport was, in fact, confiscated by American Samoa Immigration officials and not directly by the Coast Guard itself, the evidence would strongly support the inference that it was nonetheless confiscated, for all intents and purposes, on behalf of the Coast Guard.

[4] The Government made several statements at the June 21, 2016 motions hearing to the effect that Han was merely confined within a jurisdiction, which does not constitute custodial confinement. In some of these statements, it is clear that the Government was referring to Han's confinement to the jurisdiction of United States since having arrived here, and in others, it is clear that the Government was referring to Han being confined to the jurisdiction of American Samoa prior to coming to the United States. Indeed, it is clear from the immigration hold put in

the investigation, Han repeatedly asked to leave American Samoa and return to South Korea, but his requests were denied.  In addition to his request to leave on his rebooked July 8, 2015 flight, as mentioned above, the record includes a July 21, 2015 email – sender and recipients redacted – which states as follows:  "Chief Engineer [REDACTED] want to leave to Korea asap.  Much appreciated your help."  (Venue Reply Ex. 1).  Additionally, the record shows that, even after the inspection was completed, "the Captain of the vessel . . . asked if . . . Han could depart," which request was again denied.  (Venue Sur-Sur-Reply Ex. A).

On August 5, 2015, the Captain of the Port for Honolulu notified the *Pacific Breeze* via letter that the Coast Guard had "exercised its authority, in agreement with the local government in American Samoa, to withhold [the vessel's] American Samoa Customs departure clearance" because it had determined that reasonable cause existed "to believe the vessel, its owner, operator, or person in charge may be subject to criminal or civil penalties for violations of" MARPOL and APPS.  (Venue Mot. Ex. 3).  The letter also stated that the Coast Guard would "request American Samoa Customs departure clearance be granted upon execution of a security agreement including the filing of a surety bond or other satisfactory surety and other pledges and promises."  (*Id.*).

---

place by American Samoa at the request of the Coast Guard on or around the time that the inspection ended on August 5, 2015 (discussed in greater detail *infra*) that Han was confined to the jurisdiction of American Samoa from that time until he left for the United States on October 25, 2015. (Venue Sur-Sur-Reply Ex. A).  But the Government has not specifically addressed, either at the motions hearing or in its Venue Opposition, Han's sworn assertion that "[w]hile the Coast Guard's inspection was in progress" – *i.e.*, from July 7, 2015 through August 5, 2015 – he "repeated [his] desire to leave American Samoa and return to Korea," but "was not allowed to leave **the vessel**."  (Venue Mot. Ex. 1 ¶¶ 21-22) (emphasis added).  Accordingly, the court will credit Han's declaration that he was confined to the *Pacific Breeze* during the nearly month-long pendency of the investigation, prior to the immigration hold being put in place, which then confined him more broadly to the jurisdiction of American Samoa.

The next day, August 6, 2015, the Legal Officer for the Fourteenth Coast Guard District wrote a letter to the Attorney General of American Samoa asking him to prohibit six individuals, including Han, from leaving American Samoa until a security agreement was executed between the United States and PBF.  (Venue Mot. Ex. 4) (names redacted, but listing "Chief Engineer; Nationality: Republic of Korea").  The letter stated that the Coast Guard had determined that "reasonable cause exists to believe the vessel, its owner, operator, or person in charge may be subject to criminal penalties for violations of the MARPOL Protocol and [APPS], and other relevant laws and regulations."  (*Id.*).  Around this same time, "an immigration hold was placed on the crew [of the *Pacific Breeze*] by American Samoa Immigrations," presumably as a result of the Coast Guard's request.  (Venue Sur-Sur-Reply Ex. A).

    c.   Han's Transportation To The United States Pursuant To The Terms Of
           A Security Agreement Between The U.S. Government And His Employer

On September 3, 2015, a security agreement was signed between PBF and the United States, which allowed the *Pacific Breeze* to be released in exchange for PBF posting a surety bond of $400,000 (the "Security Agreement").  (Venue Mot. Ex. 5).  The only parties to the Security Agreement were PBF and the U.S. Coast Guard.  (*Id.*).  The Security Agreement states that "[n]othing in this Agreement is to be deemed as binding on non-parties" such as Han or the other crewmembers identified therein.  (*Id.* ¶ 9).

The Security Agreement contains a number of provisions that are relevant here, including that:

- "At the request of the U.S. Coast Guard acting on behalf of the United States," Han and the other crewmembers identified therein "will remain within . . . the jurisdiction of the U.S. District Court of the District of Columbia" (*id.* ¶ 3);

- The United States will secure the immigration status necessary to bring the crewmembers to the Washington, D.C. area, and PBF will provide transportation costs from American Samoa to the Washington, D.C. area, provide financial support to the crewmembers while they are in the Washington, D.C. area (including reasonable lodging, healthcare coverage,

and a daily meal allowance), and inform the Government of where the crewmembers are housed in the Washington, D.C. area (*id.*);

- PBF "agrees to facilitate interviews of any officer or crewmember employed by [PBF] at the time such a request is made by the United States," to "cooperate with the United States to arrange for testimony of such employed officer or crewmember," and to "encourage these officers and crewmembers to cooperate with the United States in carrying out its investigation and in appearing for their scheduled testimony" (*id.* ¶ 2);

- Because PBF "cannot exercise complete control over the ship's officers and crewmembers," its "obligations in respect to ensuring any ship's officer or crewmember remains within or returns to the jurisdiction of the U.S. District Court of the District of Columbia shall be limited to . . . requesting such ship's officers and crewmembers to surrender their passports to the Vessel's agent . . . for safekeeping," "requesting such ship's officers and crewmembers to remain within the jurisdiction of the U.S. District Court of the District of Columbia," and providing the lodging, meal allowance, healthcare coverage, and transportation set forth above (*id.* ¶ 7);

- If any officer or crewmember "refuses to surrender his passport," PBF "shall immediately provide actual notice" to the Government (*id.*); and

- If any officer or crewmember "requests the return of his passport," PBF "shall provide actual notice to the United States . . . at least 72 hours before returning the passport to the ship's officer or crewmember" (*id.*).

Additionally, while PBF was required to provide notice of the Security Agreement and its provisions "to all affected ship's officers and crewmembers," there is no evidence that Han or any of his shipmates were given such notice, or that they were provided with a copy of the Security Agreement, let alone a copy translated into Korean. (*Id.* ¶ 3). Accordingly, there is no evidence that Han was actually made aware of the fact that "[n]othing in th[e] Agreement [was] to be deemed as binding on non-parties" such as himself. (*Id.* ¶ 9).

On September 10, 2015, U.S. Immigration and Customs Enforcement granted the Coast Guard's request for Significant Public Benefit Parole ("SPBP") on Han's behalf, allowing him to be paroled into the United States for a period of six months. (Venue Reply Ex. 2). The SPBP explicitly states that the "REQUESTING LAW ENFORCEMENT AGENCY WILL MAINTAIN CLOSE AND CONSISTENT SUPERVISION DURING THE AUTHORIZED

PAROLE PERIOD AND WILL TAKE IMMEDIATE AND APPROPRIATE MEASURE IF THE SUBJECT ABSCONDS." (*Id.*) (capitalization in original).

On October 25, 2015, Han and the other crewmembers identified in the Security Agreement were flown from American Samoa to Dulles International Airport in Virginia, with a layover in Honolulu, Hawaii. (Venue Mot. Ex. 1 ¶¶ 27-28, 30). Han's passport – which was being held by American Samoa Immigrations after being confiscated by the Coast Guard on July 7, 2015 – was returned to him before he left American Samoa. (Venue Sur-Sur-Reply Ex. A; Venue Mot. Ex. 1 ¶ 16; Venue Opp'n at 5).

Han declares that he was not free to go where he wanted while en route to the Washington, D.C. area, including while in Hawaii (Venue Mot. Ex. 1 ¶¶ 29, 31), and that during this time he and the other crewmembers were under the constant supervision of a PBF employee. (Venue Mot. at 4). The Government points out, however, that Han was never formally arrested in American Samoa, that he had his passport with him while in transit to the United States (as well as for several months thereafter, until on or about March 21, 2016), and that he "was not accompanied by law enforcement agents, and therefore not in custody or under arrest," while in Hawaii. (Venue Opp'n at 5). The Government thus concludes that Han "was free to go where he chose to go" while in Hawaii, and that his "claim that he was not free to leave is not true." (*Id.*).

Han responds that he was only "given his passport so he could travel to the United States," and states that PBF "did not retrieve it in a timely way," meaning that "the fact that he had it in his possession was contrary to the Security Agreement, and appears to have been the consequence of an administrative oversight on the part of" PBF. (Venue Reply at 5) (citation omitted). Han states that PBF's error in failing to retrieve the crewmembers' passports upon their arrival in Virginia "was discovered when the attorney for several other crewmembers

requested the return of his clients' passports and the attorney for [PBF] realized he did not have those passports in his possession.  The attorney for [PBF] then immediately collected the passports he was required to maintain pursuant to the Security Agreement."  (*Id.* at 5 n.5).[5]

    d.  <u>Han's Time In The Washington, D.C. Area</u>

Since their arrival in October 2015, Han and the other crewmembers identified in the Security Agreement (other than Sundquist)[6] have been housed in Virginia pursuant to the terms of the Security Agreement.  (Venue Mot. Ex. 1 ¶ 32).  A Coast Guard investigator periodically contacts Han's attorney to ensure that he is in the Washington, D.C. area.  (*Id.* ¶ 39; Venue Opp'n at 5).  Han states that, during this entire time, he has "not been allowed to return to Korea."  (Venue Mot. Ex. 1 ¶ 33).

On March 17, 2016, Han's attorney wrote an email to a Government attorney requesting, among other things, that the Government let him know "whether the United States is willing to approve Mr. Han's return to Korea."  (Venue Mot. Ex. 6).  On March 29, 2016, the same Government attorney wrote an email to Han's attorney, under a separate subject line, stating: "I understand Mr. Han has requested the return of his passport under the terms of the surety. We intend to file a Complaint and I anticipate that our position will be that bond will be inappropriate."  (*Id.*).

## II.    LEGAL STANDARD

    a.  <u>18 U.S.C. § 3238</u>

Article III of the United States Constitution requires that the trial of all crimes "be held in the State where the said Crimes shall have been committed."  U.S. Const. art. III, § 2, cl. 3; *see*

---

[5] *See also* Venue Mot. Ex. 1 ¶ 38 (declaring, in March 2016, that "Pacific Breeze Fisheries, LLC holds my passport").

[6] According to Han, Sundquist – a U.S. citizen – is presently living in Florida.  (Venue Mot. at 4 n.2).

*also* Fed. R. Crim. P. 18 ("[T]he government must prosecute an offense in a district where the offense was committed.").  The Sixth Amendment further provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.

Article III also states, however, that when a crime is "not committed within any State, the Trial shall be at such Place . . . as the Congress may by Law have directed."  U.S. Const. art. III, § 2, cl. 3.  Accordingly, Congress enacted 18 U.S.C. § 3238, which states:

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or first brought; but if such offender [is] not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender . . . or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. § 3238.  It has been observed that "this statute permits the government to handpick its forum in the case of a person first found overseas, by picking the district to which it will return him."  2 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 304 (4th ed. 2016).

Neither party disputes that section 3238 applies here.  Since Han was never formally arrested in American Samoa, the question for the court to decide in ruling on the Venue Motion is whether Han was "first brought" to Hawaii under the facts and circumstances present here.  Importantly, the Government bears the burden of establishing proper venue in a criminal action.  *See United States v. Hong Vo*, 978 F. Supp. 2d 49, 52 (D.D.C. 2013) (citing *United States v. Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991)).

## III.   ANALYSIS

### a.   The Definition Of "First Brought" In Section 3238

If Han was, in fact, "first brought" to Hawaii, then venue is appropriate there under the first prong of the statute.  18 U.S.C. § 3238.  But if Han was not "first brought" to Hawaii, the

first prong of the statute does not apply, nor does the second prong of the statute, as Han has no "last known residence" in any United States district. *Id.* Accordingly, if Han was not "first brought" to Hawaii, venue is appropriate in this district, which the third prong of the statute names as the fallback venue for "offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district." *Id.*

Han contends that "first brought" within the context of section 3238 means "first brought in custody with liberty restrained." (Venue Mot. at 6) (citations omitted). The Government gives "first brought" a similar gloss, acknowledging that "[t]he evident purpose of the 'first brought' language is to capture situations where a defendant is detained to a degree equivalent to formal arrest, but without the formality." (Venue Sur-Reply at 2-3 n.1) (citing *Hong Vo*, 978 F. Supp. 2d at 58).

The precise locution preferred by Han originates from *United States v. Erdos*, in which the Fourth Circuit held that the words "first brought" provide that venue is in "that district within the United States where the offender is first restrained of his liberty in connection with the offense charged" or, in other words, where the offender is "first brought ***in custody*** with liberty restrained." 474 F.2d 157, 160-61 (4th Cir. 1973) (emphasis in original) (citations omitted). *Erdos* was cited approvingly in *Hong Vo*, the most recent case from this district to address the meaning of the phrase "first brought" in section 3238:

> The term "first brought" in the statute has a meaning distinct from the term "arrested." A defendant is "arrested" under section 3238 where the defendant is first restrained of his liberty in connection with the offense charged. But the term "first brought" in the statute applies only in situations where the offender is returned to the United States already in custody. To be "first brought" into D.C. under section 3238, then, an offender must have been arrested somewhere other than the United States and brought in custody to this district. *Erdos*, 474 F.2d at 161 ("'[f]irst brought' within the context of the statute means first brought in custody with liberty restrained").

*Hong Vo*, 978 F. Supp. 2d at 58 (emphasis removed) (citations and quotations omitted).  Other cases outside of this district have also held custody to be the relevant touchstone in the "first brought" analysis.[7]

b.   The Definition Of "Custody"

The parties and the case law are in agreement that, in order to answer the question of whether Han was "first brought" to Hawaii within the meaning of section 3238, the court must first answer another question:  Was Han "in custody" during his layover in Hawaii?  Unfortunately, the parties have failed to marshal any case in which a defendant who claimed – as Han does here – to be in functional or *de facto* custody while in transit to the United States was found to have been "first brought" to the district where his or her plane first touched down or ship first landed before being formally arrested in another district.[8]  The court has also failed to locate any such case.

---

[7] *See*, *e.g.*, *United States v. Liang*, 224 F.3d 1057, 1060 (9th Cir. 2000) ("We have followed the Second Circuit in finding that 'brought' under § 3238 means first brought into a jurisdiction from outside the United States' jurisdiction while in custody.") (alteration removed) (citation and quotation omitted); *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984) ("We need not concern ourselves with the term 'first brought,' as that applies only in situations where the offender is returned to the United States already in custody.") (citing, *inter alia*, *United States v. Provoo*, 215 F.2d 531, 537 (2d Cir. 1954)); *Chandler v. United States*, 171 F.2d 921, 933 (1st Cir. 1948) ("the district into which the accused is first taken under custody and landed is the district into which the accused is 'first brought'"); *United States v. Holmes*, 672 F. Supp. 2d 739, 740 (E.D. Va. 2009) ("Defendant returned to the United States under no form of restraint or custody.  Therefore, it cannot be said that Defendant was 'first brought' into the Eastern District of Virginia when he returned from his deployment in Qatar."); *United States v. Lee*, 159 F. Supp. 2d 1241, 1249 (D. Haw. 2001) ("The term 'first brought' in § 3238 only refers to situations in which the offender is returned to the United States already in custody.").

[8] The cases that Han cites as corollaries to the instant case are not particularly helpful.  In *Hong Vo*, for example, the absence of a layover in another district meant that the court did not need to reach the question of whether the defendant was in custody while in transit to the United States.  *See* 978 F. Supp. 2d at 58 n.10 ("The Court need not resolve whether Binh Vo was arrested in Vietnam or Virginia to determine venue under section 3238.  If Binh Vo was arrested in Vietnam and brought in custody to Dulles International Airport, he was 'first brought' to the Eastern District of Virginia.  Likewise, if he traveled voluntarily to Dulles and was subsequently arrested there, he was 'arrested' in the Eastern District of Virginia.").  Similarly, in *United States v.*

Given the lack of directly applicable precedent, the court must determine whether the facts and circumstances of this case meet an appropriate definition of "custody."  Han contends that the operative question in determining whether he was in custody is whether a reasonable person in his position would have believed that he was free to go where he wanted while in Hawaii.  He contends that, in answering that question, the court should look to what he terms "comparable Fourth Amendment jurisprudence," which provides that "a person is 'seized' by the government 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  (Venue Reply at 5 n.6) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  The Government argues that *Mendenhall* is inapplicable to this case because it concerned mere seizure, as opposed to custody or arrest, and that the court should look to *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, which provide that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' to the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).   Han disagrees on the basis that *Miranda* concerns not custody, generally, but the specific context of custodial interrogation by the police and the constitutional guarantee against self-incrimination, which are irrelevant to the purely statutory venue standard set forth in section 3238.  Han also

---

*Ivencio-Belique-Emilia*, the Third Circuit did not need to answer the question of whether a functional or *de facto* arrest by someone other than law enforcement – there, the captain of the ship on which the defendant had stowed away – could constitute custody, thereby triggering the "first brought" provision of section 3238.  *See* 65 F. App'x 788, 790 (3d Cir. 2003) ("Here, venue in the District of the Virgin Islands was proper whether, as the government argues, Belique-Emilia was first arrested by INS Inspector Soria after Belique-Emilia entered St. Croix or whether, as Belique-Emilia maintains, he was first arrested by Captain Rivers in international waters.  If the arrest occurred on St. Croix, venue in the District of the Virgin Islands was proper because Belique-Emilia was arrested in that district.  Similarly, if the arrest occurred in international waters, venue in the District of the Virgin Islands is still proper because that is the district into which Belique-Emilia was first brought after the arrest.  We thus reject Belique-Emilia's venue argument.").

points to habeas corpus jurisprudence, which provides that a person can be in custody even if he is not in the actual physical custody of a government official, and argues that no matter what standard the court uses, it should conclude that he was in custody while in Hawaii.

> c.  Under The Facts And Circumstances In This Case, Han Was In The Functional Equivalent Of "Custody" While In Hawaii

The court has assessed the custody question under each of the different definitions and frameworks that have been offered by the parties, keeping in mind Black's Law Dictionary's definition of "physical custody" as "[c]ustody of a person (such as an arrestee) whose freedom is directly controlled and limited." *Physical Custody*, Black's Law Dictionary (10th ed. 2014). The court agrees with Han that, under all of these various definitions and frameworks, he was in the functional equivalent of custody while in Hawaii.  The court's finding is based on its consideration of the following factors:

- Han is an alien seafarer who does not speak English.  (Venue Mot. Ex. 1 ¶¶ 2-3).

- Han's passport was confiscated by the United States Coast Guard when its inspection of the *Pacific Breeze* first began on July 7, 2015.  (*Id.* ¶ 16).

- It appears that the Coast Guard then gave Han's passport to American Samoa Immigration officials, who held it for the remainder of his time in American Samoa.  (Venue Sur-Sur-Reply Ex. A).

- During the nearly month-long Coast Guard inspection, Han "was not allowed to leave the vessel."  (Venue Mot. Ex. 1 ¶¶ 21-22).

- Han's request, on or around July 8, 2015, to leave the *Pacific Breeze* and return to South Korea was denied by a Coast Guard official because the Coast Guard needed to question him.  (Venue Sur-Sur-Reply Ex. A).

- The record contains a July 21, 2015 email – sender and recipients redacted – stating that "Chief Engineer [REDACTED] want to leave to Korea asap. Much appreciated your help."  (Venue Reply Ex. 1).

- After the inspection was completed, "the Captain of the vessel . . . asked if . . . Han could depart," which request was again denied.  (Venue Sur-Sur-Reply Ex. A).

- After the inspection was completed, the Coast Guard wrote a letter to the Attorney General of American Samoa asking him to prohibit Han and several of his shipmates from leaving American Samoa until a security agreement was executed between the United States and PBF.  (Venue Mot. Ex. 4) (names redacted, but listing "Chief Engineer; Nationality: Republic of Korea").

- Shortly thereafter, "an immigration hold was placed on the crew by American Samoa Immigrations."  (Venue Sur-Sur-Reply Ex. A).

- On September 3, 2015, PBF and the Coast Guard entered into the Security Agreement, which required PBF to transport Han to a location within the jurisdiction of this court, to house him there during the pendency of any investigation and/or prosecution concerning violations of law onboard the *Pacific Breeze*, and to facilitate his cooperation with the Government. (Venue Mot. Ex. 5 ¶¶ 2-3).

- While the Security Agreement acknowledged that Han was not bound by its terms and that PBF could not force him to travel to the Washington, D.C. area and remain there, it nevertheless required PBF to request that he surrender his passport "for safekeeping."  (*Id.* ¶ 7).  The Security Agreement also required that the Government be immediately notified if Han refused to surrender his passport, and that, in the event that he requested the return of his passport after surrendering it, his passport not be returned to him for at least 72 hours.  (*Id.*).

- Han was not a party to the Security Agreement, and while PBF was required to provide notice of the Security Agreement and its provisions "to all affected ship's officers and crewmembers," there is no evidence that Han was given such notice, or was provided with a copy of the Security Agreement, let alone a copy translated into Korean.  (*Id.* ¶ 3).

- Han was paroled into the United States via an SPBP, which explicitly states that the "REQUESTING LAW ENFORCEMENT AGENCY WILL MAINTAIN CLOSE AND CONSISTENT SUPERVISION DURING THE AUTHORIZED PAROLE PERIOD AND WILL TAKE IMMEDIATE AND APPROPRIATE MEASURE IF THE SUBJECT ABSCONDS."  (Venue Reply Ex. 2) (capitalization in original).

- Pursuant to the terms of the Security Agreement, Han and several of his shipmates were flown to the United States by PBF on October 25, 2015, during which time they were under the constant supervision of a PBF employee.  (Venue Mot. at 4).

- Han's passport – which had been held by American Samoa Immigration officials since it was confiscated by the Coast Guard on July 7, 2015 – was returned to him prior to his departure from American Samoa so that he could travel to the United States.  (Venue Sur-Sur-Reply Ex. A; Venue Mot. Ex. 1 ¶ 16; Venue Opp'n at 5).

- Han has declared under oath that he believed that he was not free to go where he wanted to go while en route to the Washington, D.C. area, including while in Hawaii, and there is no evidence before the court that contradicts Han's assertion that he truly held this belief (such as, for example, a declaration from a PBF employee stating that Han was told that he was free to choose not to come to the United States).  (Venue Mot. Ex. 1 ¶¶ 29, 31).

Having considered all of these factors, the court concludes that, while he was in Hawaii, Han was in custody for purposes of § 3238.  In so concluding, the court finds that Han's freedom was "directly controlled and limited," as defined by Black's Law Dictionary; that "a reasonable person [in his position] would have believed that he was not free to leave," *Mendenhall*, 446 U.S. at 554; that he was subject to "restraint on freedom of movement of the degree associated with a formal arrest," *Beheler*, 463 U.S. at 1125 (citation and quotation omitted); and that the Government was "responsible for significant restraints on [his] liberty," *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 48 (D.D.C. 2004).

The Government argues that Han was not "first brought" to the District of Hawaii because he had his passport, was not accompanied by any law enforcement personnel and was not under indictment or the subject of any criminal complaint while he was there.  But this argument overlooks the fact that, shortly before travelling to the United States, Han had been detained *by the Government* onboard the *Pacific Breeze* for an entire month, during which time he was clearly in "custody" under any definition of the word.  (Venue Mot. Ex. 1 ¶¶ 21-22).  It also overlooks the fact that Han's multiple requests to return home to South Korea – both during and after the inspection – were refused *by the Government*, and that an immigration hold was placed on him by American Samoa Immigrations *at the Government's request*.  (*Id.*; Venue Mot. Ex. 4; Venue Reply Ex. 1; Venue Sur-Sur-Reply Ex. A).  It overlooks the fact that Han's passport was taken away from him *by the Government* in early July 2015, was held by American Samoa Immigrations *at the Government's request*, and was not returned to him until late October 2015, when he was about to board a plane bound for the United States pursuant to the

terms of PBF's Security Agreement *with the Government*.  (Venue Mot. Ex. 1 ¶ 16; Venue Mot. Ex. 5 ¶¶ 3, 7; Venue Opp'n at 5; Venue Sur-Sur-Reply Ex. A).  The Government's argument also overlooks the fact that, while Han was not under law enforcement escort during his trip to the United States, he was escorted by, and under the constant supervision of, a PBF employee who was essentially acting *as an agent for the Government* pursuant to the terms of the Security Agreement.  (Venue Mot. at 4; Venue Mot. Ex. 5).  And it overlooks the fact that Han was paroled into this country via an SPBP obtained *by the Government*, which required him to be closely and consistently supervised *by the Government*, which was required to act if he absconded.  (Venue Reply Ex. 2).

Moreover, the court finds that all of these factors must be read against (i) the fact of Han's alienage and his inability to speak and understand the English language; (ii) the fact that the Security Agreement – which required that Han be notified of its provisions and explicitly stated that he was not bound by them – was never provided to him; and (iii) Han's stated belief that he was not free to go where he wanted while en route to this country, which has not been controverted by any actual evidence.  Taking all of the foregoing into consideration, it is clear to the court that Han reasonably believed that he had no choice but to board the plane and come to the United States, that he reasonably believed that he could not have simply walked away and booked a flight to South Korea while in Hawaii, and that the PBF employee escorting him to the United States was, to him, the functional equivalent of a law enforcement escort, meaning that his freedom of movement was restrained to the degree associated with a formal arrest while in transit to this country.

It is equally clear to the court that the United States Government was ultimately responsible for the many significant restraints on Han's liberty.  For all intents and purposes, the Government controlled the actions of PBF and the government of American Samoa in order to

ensure that Han ended up exactly where it wanted him – in the United States, within the

jurisdiction of this court.  The court will not countenance the Government's creative attempts to

distance – or, more appropriately, fully disconnect – itself from the chain of events that it not

only set in motion, but closely steered along every step of the way.  The Government kept Han

on board the *Pacific Breeze* during the pendency of the investigation, then it used American

Samoa Immigrations to keep him within the territory for several more weeks, and then, instead

of sending its own law enforcement officers to American Samoa to transport him to the United

States, it simply subcontracted the job out to PBF in exchange for the release of the *Pacific

Breeze*.  But all of this does not change the fact that Han, as a non-English-speaking alien

unfamiliar with American police procedures, reasonably believed, based on all of the facts and

circumstances set forth above, that the United States Government was compelling him to travel

to this country.[9]

---

[9] These facts and circumstances also demonstrate that, as far as the habeas corpus standard for custody is concerned, Han was under the constructive custody of the United States government while in Hawaii.  "[B]esides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient" to support the grant of habeas corpus.  *Jones v. Cunningham*, 371 U.S. 236, 240 (1963).  The habeas statute expressly extends not just to those strictly in custody of the United States, but also to those who are "in custody ***under or by color of the authority*** of the United States."  *Abu Ali*, 350 F. Supp. 2d at 46 (emphasis in original) (quoting 28 U.S.C. § 2241(c)(1)).  "It is enough that the imprisoning sovereign is the respondent's agent."  *Id.* at 47 (quoting *Steinberg v. Police Court of Albany, N.Y.*, 610 F.2d 449, 453 (6th Cir. 1979)).  In other words, "[a] prisoner is in the constructive custody of the United States when he is in the actual, physical custody of some person or entity who cannot be deemed the United States, but is being held under the authority of the United States or on its behalf."  *Mohammed v. Harvey*, 456 F. Supp. 2d 115, 122 (D.D.C. 2006), *aff'd sub nom. Munaf v. Geren*, 482 F.3d 582 (D.C. Cir. 2007), *vacated on other grounds*, 553 U.S. 674 (2008).  Thus, for all the same reasons set forth above, it is clear to the court that Han was in the constructive custody of the United States while in Hawaii because he was "in the actual, physical custody" of PBF, *id.*, who was transporting him to the United States on the Government's behalf, pursuant to the terms of the Security Agreement.

    d.   Han's Alienage And Inability To Speak And Understand English Are Relevant To
        <u>Whether He Was In The Functional Equivalent Of "Custody" While In Hawaii</u>

The Government contends that it is inappropriate for the court to consider Han's alienage

and the fact that he cannot speak English in determining whether or not he was in custody.  But

the court disagrees, and finds that Han's alienage and lack of proficiency in English are

permissible considerations under both the *Mendenhall* framework advocated by Han and the

*Miranda* framework advocated by the Government, and are highly relevant here.

*Mendenhall* was the landmark case that provided a workable formula for the definition of

seizure.  The Supreme Court found that a person is seized when an officer has in some way

restrained his liberty, 446 U.S. at 552 (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)); that

seizure occurs "only when, by means of physical force or a show of authority, [an individual's]

freedom of movement is restrained," *id.* at 553; and that a person "has been 'seized' within the

meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave," *id.* at 554.

Notably, the *Mendenhall* Court found that factors such as the defendant's age and the fact that

she had not graduated from high school were "not irrelevant" in the reasonable person calculus.

*Id.* at 558.  Later cases have relied on this finding in *Mendenhall* to conclude that a defendant's

inability to speak and understand English can heighten the degree of coercion involved in the

defendant's seizure, and can therefore be relevant to establishing that the defendant is in custody.

For example, in *United States v. Moreno*, the Ninth Circuit explicitly referenced

*Mendenhall*'s finding "that the characteristics of the defendant are 'not irrelevant' in determining

whether a seizure has occurred for purposes of the fourth amendment," 742 F.2d 532, 536 (9th

Cir. 1984) (quoting *Mendenhall*, 446 U.S. at 558), concluding as follows:

> Moreno's lack of familiarity with police procedures in this country, his alienage
> and his limited ability to speak and understand the English language contributed
> significantly to the quantum of coercion present at the DEA office.  The district

> court considered these additional factors and correctly found that under the totality of the evidence presented in this case Moreno was not free to leave[.]

> In sum, . . . we find that by the time Moreno had been escorted to the DEA office he had been effectively arrested.

*Id.* Here, the record indicates that, as far as Han was concerned as a non-English-speaking alien seafarer unfamiliar with American police procedures, his freedom of movement was restrained by PBF, which was acting on behalf of the Government.  Given that he was never informed of the Security Agreement's terms, including the crucial fact that he was not bound by the agreement, the governmental imprimatur attached to PBF's actions represented the requisite governmental "show of authority" as far as Han could tell.  *Mendenhall*, 446 U.S. at 553.  Accordingly,  the court finds that "in view of all of the circumstances surrounding" Han's transport from American Samoa to Virginia, "a reasonable person" in his position "would have believed that he was not free to leave" while in Hawaii.  *Mendenhall*, 446 U.S. at 554.  As in *Moreno*, then, the court concludes that Han "had been effectively arrested" while in Hawaii, 742 F.2d at 536, and that venue for this criminal proceeding is therefore appropriate in the District of Hawaii.

Contrary to the Government's claims, Han's alienage and inability to speak English are also relevant under *Miranda* and its progeny.[10]  As the Government acknowledges, the Supreme Court has held that whether or not a defendant is a child "is relevant to the custody inquiry" under *Miranda* because "'a child's age differs from other personal characteristics that, even when known to police, have no objectively discernable relationship to a reasonable person's understanding of his freedom of action.'"  (Venue Sur-Reply at 4) (emphasis removed) (quoting *J.D.B. v. N. Carolina*, 564 U.S. 261, 275 (2011)).  The Court explained that "[a] child's age is far

---

[10] "The custody test [under *Miranda*] is general, and [t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Stanley v. Schriro*, 598 F.3d 612, 619 (9th Cir. 2010) (citations and quotations omitted) (second alteration in original).

more than a chronological fact.  It is a fact that generates commonsense conclusions about behavior and perception.  Such conclusions apply broadly to children as a class." *J.D.B.*, 564 U.S. at 272 (citations and quotations omitted).  The Court buttressed its argument that a child's age should be taken into account by elaborating that children "lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," such that they "are more vulnerable or susceptible to . . . outside pressures."  *Id.* (citations omitted).

In the court's view, this logic applies with equal force to aliens who cannot speak or understand English.  The fact that a person does not speak or understand English clearly has an "objectively discernible relationship to [that] person's understanding of his freedom of action," and leads to certain "commonsense conclusions about behavior and perception" that apply broadly to non-English-speaking aliens as a class.  *J.D.B.*, 564 U.S. at 272, 275 (citation and quotation omitted).  This includes the conclusion that, while in custody, a non-English-speaking alien cannot "recognize and avoid choices that could be detrimental to them" in the same manner that an English speaker could.  *Id.* at 272 (citation and quotation omitted).  The inability to speak and understand English does not concern, as the Government appears to contend, "the psychology of the individual suspect"; rather, it concerns objective factors that bear on whether a suspect can understand a potentially custodial situation in much the same way that a child's age does.  (Venue Sur-Reply at 4) (quoting *J.D.B.*, 564 U.S. at 275).  While an adult English-speaking citizen of the United States can reasonably be expected to understand whether or not they are in custody, the same cannot be said for an English-speaking child, as reflected in *J.D.B.*, or for a non-English-speaking alien adult, as is evident from the facts and circumstances of this case, which indicate that Han did not understand that he was not under any legal compulsion to travel to the United States.

Moreover, just as they have in the *Mendenhall* context, courts have, in fact, held that a limited ability to speak and understand English is relevant to the custody analysis under *Miranda*. For example, while the Ninth Circuit acknowledged in *United States v. Kim* that the *Miranda* custody "inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned," it nevertheless concluded that Kim "was 'in custody' for *Miranda* purposes because a reasonable person in [her] circumstances would not have felt free to leave," in part because she "could well have assumed – ***especially given her limited English*** – that she was a criminal suspect." 292 F.3d 969, 973-74, 977 (9th Cir. 2002) (emphasis added) (citations omitted).[11]

Thus, in the court's view, the fact that Han is an alien who does not speak or understand English is relevant to the question of whether, under *Miranda*, there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (citation and quotation omitted). Han was transported thousands of miles from American Samoa to Hawaii, and then thousands more miles from Hawaii to Virginia, and the evidence demonstrates

---

[11] *See also Thatsaphone v. Weber*, 137 F.3d 1041, 1045-46 (8th Cir. 1998) (noting that "a suspect's language skills may be relevant to the 'in custody' issue" within the context of *Miranda* warnings, but "conclud[ing] that Thatsaphone's limited understanding of the English language" did not render an interview non-custodial because he responded affirmatively when asked if he could speak and understand English, did not express a desire to halt the interview, responded coherently in English, remained silent when asked questions he did not want to answer, and rarely used the interpreter) (citation omitted); *United States v. Ceballos*, 812 F.2d 42, 48 (2d Cir. 1987) ("In light of Agent Powers' 'request' to come to the field office for questioning, ***Adames' difficulty with English***, the agents' omission of any statement conveying to Adames a choice in the matter, and the sense of urgency and obligation admittedly conveyed, we have serious doubt whether a reasonable person in Adames' position would have felt that he was not free to accompany the agents the moment they left Royal Molds.") (emphasis added); *see also id.* at 48 n.4 ("The reasonable person test does not place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question. Nonetheless, we believe that the test does recognize obvious incapacities that critically bear upon voluntariness such as a lack of fluency in English or a significant hearing impairment.") (citations and quotation omitted).

that he reasonably believed – in part due to his alienage and inability to understand the English language – that he was compelled to undertake this journey by the United States Government, which was acting through an agreement with PBF that was never shared with him.  While there may not have been any custodial interrogation in this case, these facts and circumstances amount to much more than some brief non-custodial seizure or detention.  They amount, in the court's view, to the functional equivalent of custody or arrest.

   e.   Because Han Was In The Functional Equivalent Of "Custody" While In Hawaii, He Was "First Brought" To The District Of Hawaii Under Section 3238

   Given the court's finding that Han was in the functional equivalent of "custody" while in Hawaii, the court finds that Han was "first brought" to the District of Hawaii within the meaning of section 3238, and that venue is appropriate there, not here.  The court will therefore grant Han's Venue Motion.  Because the court will grant the Venue Motion, it need not address any of the arguments raised in the FTSO Motion, which the court will deny as moot.

   At the June 21, 2016 hearing on Han's motions for dismissal, counsel for the Government argued that if the court was inclined to grant the Venue Motion, the proper remedy would be transfer to the District of Hawaii, not dismissal of the Indictment.  The Government did not provide any case law or statutory support for this contention either at the hearing or in its Venue Sur-Reply, which was filed shortly after the hearing.  Counsel for Han stated at the hearing that, if the Venue Motion was granted, the appropriate remedy would be dismissal of the Indictment.  Counsel for Han is correct – "[w]hen venue is improperly laid in a criminal case, dismissal is the appropriate remedy because a district court has no power to transfer such a case to a proper venue."  *Hong Vo*, 978 F. Supp. 2d at 64 (citations and quotation omitted).  Accordingly, because the court will grant Han's Venue Motion, it will dismiss without prejudice the Indictment now pending against him in this district.

The Government has also requested that the court hold in abeyance any order granting the Venue Motion in order to give it time to "file appropriate charging documents in the District of Hawaii." (Venue Opp'n at 6). The court will grant this request, and will hold the Order accompanying this Memorandum Opinion in abeyance for a period of **<u>ten days</u>** from its issuance date in order to give the Government time to file the appropriate charging documents in the District of Hawaii, if it chooses to do so.

IV.     **CONCLUSION**

For the foregoing reasons, the Venue Motion is hereby **GRANTED**. Accordingly, the Indictment against Han is hereby **DISMISSED WITHOUT PREJUDICE**, and the FTSO Motion is hereby **DENIED AS MOOT**.

An appropriate Order accompanies this Memorandum Opinion. The Order will be **HELD IN ABEYANCE** for a period of **<u>ten days</u>** from its issuance date in order to give the Government time to file the appropriate charging documents in the District of Hawaii.

Date:  August 3, 2016

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge